## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

ROBERT TAGLIONE,
*et al.*,

        **Plaintiffs,**

              **Case No. 2:19-cv-528**

    **vs.**              **Judge Sarah D. Morrison**

              **Chief Magistrate Judge Elizabeth P. Deavers**

CHARTER COMMUNICATIONS,
LLC,

        **Defendant.**

## <u>OPINION AND ORDER</u>

This matter is before the Court on Defendant's Motions for Summary Judgment. (ECF Nos. 32, 33.) Plaintiffs have filed Responses (ECF Nos. 40, 41), and Defendant has filed Replies (ECF Nos. 42, 43). These matters are now ripe for decision.

## I.    FACTUAL BACKGROUND

Because this is a motion for summary judgment filed by the defendant, all disputed facts are construed in the light most favorable to the plaintiffs. *Davenport v. Causey*, 521 F.3d 544, 546 (6th Cir. 2008).

Defendant Charter Communications, LLC, ("Charter") operates an Inbound Sales Call Center in Columbus, Ohio (the "Call Center"). The Call Center is led by a Vice President of Inbound Sales (the "VP"), who oversees a Director of Inbound Sales (the "Director"). (Ronald Johnson Dep. 87:11–90:2, ECF No. 37-1.) Next in the supervisory chain are five Inbound Sales Managers ("ISMs"), who each oversee a team of five or six supervisors, who in turn supervise

approximately twelve to fifteen agents. (Rhonda Hatfield Dep. 27:11–22, ECF No. 36-1.) Plaintiffs Robert Taglione and Andrew Lucas were long-time employees of Charter or its predecessor companies, and until summer 2018, they were ISMs in the Call Center. (Tanya Joseph Decl. ¶ 6 & n.1, ¶ 7 & n.2, ECF No. 34.)

In July 2017, Ronald Johnson transferred from one of Charter's California offices to become the new VP of the Call Center. (*Id.* ¶ 8; Johnson Dep. 9:22–10:5.) At that time, the Call Center was regularly ranked as Charter's worst-performing call center. (Andrew Lucas Dep. 44:22–45:5, ECF No. 35-1; Hatfield Dep. 19:12–20:4.) Similarly, the Call Center's ISMs were ranked consistently at the bottom of the centers' managerial rankings. (Lucas Dep. 90:5–20.) At that point in time, the ISMs were Mr. Taglione, Mr. Lucas, Rhonda Hatfield, Nancy Baker, and John Walker. (Robert Taglione Dep. 115:8–24, 118:13–24, ECF No. 35-2; John Walker Dep. 9:1–10, ECF No. 38-1.)

Once he took the reins of the Call Center, Mr. Johnson ruled with an iron fist. He talked down to the ISMs; he yelled, swore at, interrupted, and micromanaged them; he threatened their jobs; and he criticized and undercut them in front of their subordinates. (Lucas Dep. 36:7–18, 50:4–7, 108:9–14, 109:8–10; Joseph Decl. Ex. E, at 1-2; Taglione Dep. 42:12–22; Hatfield Dep. 39:14–40:19, 57:1–58:5; Nancy Baker Decl. ¶ 5, ECF No. 39-1; Andy Lucas Decl. ¶ 5, ECF No. 39-2; Robert Taglione Decl. ¶ 5, ECF No. 39-3.) Mr. Johnson also frequently promoted the idea that the ISMs were dragging the Call Center down by remaining stuck in their old ways. He likened the ISMs to "barnacles" slowing down the advancing ship that was the Call Center operation. (Joseph Decl. Ex. D, at 1; *id.* Ex. E, at 2; Taglione Dep. 52:20–53:10; Hatfield Dep. 54:16–55:1.) He told Mr. Lucas that he needed to create "Andy 2.0," he told ISMs that they

needed "fresh" ideas, and he asked ISMs to bring more energy to the job. (Lucas Dep. Ex. 6, ECF No. 35-1, at 127; Hatfield Dep. 63:4–17, 134:7–10; Lucas Decl. ¶ 5; Taglione Decl. ¶ 5.)

This changed, to an extent, in March 2018 when Ms. Hatfield was promoted to Director. (Joseph Decl. ¶ 8.) Mr. Johnson began to take a backseat to Ms. Hatfield and became less involved with managing the ISMs. (Baker Decl. ¶ 17; Hatfield Dep. 77:4–78:2.)

Charter has an escalating protocol in place for underperforming employees. One of the first steps is to put the employee on a performance plan, a performance memorandum, or a development plan, all of which are precursors to a performance improvement plan ("PIP"). (Hatfield Dep. 119:8–15; Lucas Dep. 198:4–8.) Unsuccessful completion of a PIP may result in suspension or termination, although the PIP might be extended instead. (Hatfield Dep. 120:6–17.)

While a PIP is a serious development, it is not a death knell. Charter has had employees successfully complete a PIP, some of whom remain with the company. (*Id.* 119:19–120:5.) In 2018 and 2019, at least seven people at the supervisor level or above successfully completed a performance memorandum or a PIP. (*Id.* 142:17–146:7, 181:7–18.) For example, Andrew Smith, an ISM in his early thirties, was put on a performance memorandum in November 2018 and completed it in approximately six weeks. (*Id.* 145:13–146:7; Joseph Decl. ¶ 5.) The Director of Training, Genese John, age thirty-six, was also put on a PIP, and she was ultimately terminated for "performance-related deficiencies" before reaching forty. (Joseph Decl. ¶¶ 5, 10(d).)

On May 1, 2018, Ms. Hatfield placed Ms. Baker on a PIP. (Hatfield Dep. Ex. 2.) Ms. Hatfield alone decided the substance of this PIP, although Mr. Johnson was aware that it was occurring. (*Id.* 116:18–118:10; 151:16–19.) Ms. Baker resigned her position at the end of that

same month, and she was replaced by Andrew Smith. (Baker Decl. ¶¶ 24–25; Hatfield Dep. 68:23–69:5.)

On May 4, 2018, Ms. Hatfield provided Mr. Taglione with a Development Plan in which she relayed her concerns to him regarding his team's performance, his managerial style, and his conduct. (Taglione Dep. 306:3–307:5; *id.* Ex. 17, ECF No. 35-1, at 137–38; Hatfield Dep. 103:15–20.) On May 25, 2018, Ms. Hatfield told Mr. Taglione that he was going to be put on a PIP. (Taglione Decl. ¶ 14.) However, she never began drafting the PIP. (Hatfield Dep. 152:1–3.)

Also in May 2018, Mr. Taglione applied for a transfer to an Account Executive position and to a Direct Sales Manager position. (Joseph Decl. ¶ 15(c), (d).) He was not selected for the Direct Sales Manager position, although the Account Executive application remained pending. (*Id.*) Mr. Taglione does not know who made the hiring determination for the Direct Sales Manager position. (Taglione Dep. 207:24–208:16.) It does not, however, appear that Mr. Johnson or Ms. Hatfield had any role in that decision. (*See id.* 208:3–20.) Mr. Taglione applied for these two jobs after learning that he was being placed on the Development Plan, but he does not recall whether he had yet been notified about the PIP. (*Id.* 224:6–25.) Mr. Taglione had also previously applied in April 2017 and September 2017 for two other internal positions, but he was not chosen for either. (*Id.* 217:8–20; Joseph Decl. ¶ 15(a), (b).)

On June 7, 2018, Mr. Taglione applied for a transfer to a Direct Sales Representative position. (Joseph Decl. ¶ 15(e); Taglione Dep. 206:17–18.) He was offered the job, and he accepted it, which terminated his still-pending Account Executive application. (Joseph Decl. ¶ 15(c), (e).) Mr. Taglione remained in this new position until December 2018 when he resigned for medical reasons. (Taglione Dep. 18:24–19:23.)

On June 25, 2018, Ms. Hatfield told Mr. Lucas that he was going to be put on a PIP if he did not improve his "numbers." (Lucas Dep. 71:10–18.) On the morning of June 29, 2018, she told him that she was putting him on a performance notice, that expectations for him would be very high, and that it would be difficult for him to meet those expectations. (*Id.* 193:17–194:4, 195:9–14; Lucas Decl. ¶ 16.) She also suggested that he retire. (Lucas Dep. 195:9–16.) That same morning Mr. Lucas submitted his resignation letter and began to negotiate the terms of his retirement. (Lucas Decl. ¶¶ 17–18.) Ms. Hatfield never began drafting a PIP or performance memorandum for Mr. Lucas. (Hatfield Dep. 152:7–15.)

## II.   STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir.1993). The burden then shifts to the nonmoving party to "'set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "summary judgment will not lie . . . if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

## III.   ANALYSIS

Plaintiffs allege that they have suffered age discrimination in violation of O.R.C. § 4112.14. (Pl. Resp. to Mot. J. Pleadings, ECF No. 23, at 2–5; ECF No. 26, at 11.) Mr. Taglione alleges that this discrimination caused his constructive demotion and the denial of his applications for internal transfers. (Taglione Resp. to Def. Mot. for Summ. J., at 15–16, ECF No. 40.) Mr. Lucas alleges that this discrimination resulted in his constructive discharge. (Lucas Resp. to Def. Mot. for Summ. J., at 16, ECF No. 41.)

Section 4112.14 protects qualified employees aged forty or older from being discriminated against "in any job opening" or from being "discharge[d] without just cause." Ohio Rev. Code Ann. § 4112.14(A) (West 2020). Where a plaintiff-employee offers direct, circumstantial, or statistical evidence of discrimination, he/she establishes a *prima facie* case of discrimination by showing "that the employer more likely than not was motivated by discriminatory animus." *Mauzy v. Kelly Servs.*, 664 N.E.2d 1272, 1279 (Ohio 1996). Here, there exists direct evidence of discrimination, so this is the appropriate evaluative standard.

However, even where direct evidence exists, the employee still must show that there was "a consequential prohibited act." *Id.* at 1280. Under the statute that means a "discharge" or discrimination in the context of a job opening. Ohio Rev. Code Ann. § 4112.14(A). "Other actions, such as transfers or promotions, are not prohibited unless they amount to a "discharge.'" *Mauzy*, 664 N.E.2d at 1280.

### A.  Robert Taglione

Mr. Taglione alleges that he was constructively demoted and that this is actionable under the statute. It is not. He cites three cases for the proposition that a "[c]onstructive demotion constitutes [a] constructive discharge under the law." (ECF No. 40, at 16.) But all three cases interpret Title VII, a dissimilar statute. *See Carter v. Ball*, 33 F.3d 450, 455–56 (4th Cir. 1994); *Jurgens v. EEOC*, 903 F.2d 386, 387 (5th Cir. 1990); *Petrovsky v. U.S. Att'y Gen.*, No. 1:16cv44, 2018 WL 1937070, at *1 (N.D.W.V. Apr. 24, 2018). Title VII prohibits a much wider range of discrimination than § 4112.14. *See* 42 U.S.C. 2000e-2(a)(1) ("It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, *or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment* . . . . (emphasis added)). These cases are thus not useful in interpreting § 4112.14. The statute's text indicates that it does not apply to a constructive demotion, and Mr. Taglione offers no cases saying that it does.

Mr. Taglione's only other argument in support of his constructive demotion claim is a policy one. He contends that he should not be punished for "properly mitigating his damages by accepting a lower position to maintain needed health insurance . . . ." (ECF No. 40, at 16.) However, the statute does not prohibit discriminatory actions beyond discharges and discrimination with respect to job openings. *See Mauzy*, 664 N.E.2d at 1280 ("[The statute] proscribes discriminatory discharges, not transfers."). "This is a legislative choice that [the Court] cannot disturb." *Id.* Even assuming that Mr. Taglione was constructively demoted as a result of his age, this is not actionable discrimination under the statute.

Finally, Mr. Taglione obliquely argues that his denied transfer applications also were the result of age discrimination. While this would be a consequential prohibited act, this aspect of

Mr. Taglione's claim still falls short. This is because Mr. Taglione does not link any of his evidence of discrimination to these denied transfers. "Absent some causal connection or link between an employer's discriminatory statements or conduct and a plaintiff-employee, there is no permissible inference that the employer was motivated by discriminatory animus to act against the plaintiff-employee." *Byrnes v. LCI Commc'n Holdings Co.*, 672 N.E.2d 145, 149 (Ohio 1996).

Mr. Taglione has introduced evidence that, construed in the light most favorable to him, could be viewed as evidence of age discrimination. For example, Mr. Johnson's barnacles comment, his emphasis on "freshness" and "newness," and the disparate treatment by Mr. Johnson and Ms. Hatfield of some of Charter's older workers is evidence that age discrimination was afoot. But even when there exists direct evidence of age discrimination, "an employee [still] must prove a causal link or nexus between evidence of a discriminatory statement or conduct and the prohibited act of discrimination to establish a violation." *Id.*

Mr. Taglione cannot tie any of this evidence of discrimination to his denied transfers. He applied for five transfers, three of which resulted in rejections. Two occurred in 2017, prior to any of the allegedly discriminatory events that Mr. Taglione alleges. And as for the third—the denied transfer to the Direct Sales Manager position—he offers no evidence that anyone involved in the denied transfers exhibited any age discrimination or that the positions were filled with individuals who were younger and less deserving. Notably, Mr. Taglione's evidence of age discrimination only involves actions by Mr. Johnson and Ms. Hatfield, but he offers no evidence that either had any say in his inability to transfer to the Direct Sales Manager position.

Nor does Mr. Taglione argue that such a causal link exists. His response to Charter's Motion for Summary Judgment makes no effort to explain why these denied transfers were the

result of age discrimination. Thus, while these denied transfers could theoretically be covered by the statute, there is no relationship between them and the evidence of age discrimination.

Charter's Motion for Summary Judgment on Mr. Taglione's claims is **GRANTED**.

## B.    Andrew Lucas

Mr. Lucas argues that he was constructively discharged, and unlike Mr. Taglione's constructive demotion claim, constructive discharge is plainly covered by the statute. The key question is thus whether Mr. Lucas has presented sufficient evidence to sustain a constructive discharge claim.

The test for evaluating whether an employee was constructively discharged is an objective one. *Mauzy*, 664 N.E.2d at 1280. The question is "whether the employer's actions made working conditions so intolerable that a reasonable person under the circumstances would have felt compelled to resign." *Id.* at 1280–81. "In applying this test, courts seek to determine whether the cumulative effect of the employer's actions would make a reasonable person believe that termination was imminent." *Id.* at 1281; *accord Nunn v. Lynch*, 113 F. App'x 55, 59 (6th Cir. 2004) ("An apparently voluntary resignation does not rise to the level of constructive discharge unless it is objectively reasonable for the employee to leave under the circumstances."). While "[n]o single factor is determinative," relevant factors include "reductions in sales territory, poor performance evaluations, criticism in front of coemployees, inquiries about retirement intentions, and expressions of a preference for employees outside the protected group." *Mauzy*, 664 N.E.2d at 1281.

Mr. Lucas asserts that he felt compelled to resign because of the hostile work environment that Mr. Johnson had created, because he saw how Ms. Baker and Mr. Taglione had been "forced out," and because Ms. Hatfield told him that he was going to be placed on a

performance notice. The first two reasons are insufficiently linked to Mr. Lucas's departure, and the third could not reasonably be interpreted as a sign that his termination was imminent.

Beginning with Mr. Johnson's behavior, Mr. Lucas has presented evidence that Mr. Johnson was a difficult boss, a bully, and potentially even that he perpetrated age discrimination. But by the time Mr. Lucas retired in June 2018, he had been supervised by Ms. Hatfield for three months. There is no evidence that Mr. Johnson had any relevant role in this supervision or that any of his objectionable conduct occurred during this time frame. There is thus no evidence demonstrating a nexus between this conduct and Mr. Lucas's departure. *See Byrnes*, 672 N.E.2d at 149; *Vogt v. Total Renal Care, Inc.*, No. 103102, 2016 WL 3763074, at *6 (Ohio Ct. App. July 14, 2016) ("That Vogt took so long to resign demonstrates that she did not fear imminent termination and was not enduring intolerable working conditions.").

The same is true for Ms. Baker's and Mr. Taglione's circumstances. Mr. Lucas's claim can only survive if *he* was constructively discharged on account of age. *See Byrnes*, 672 N.E.2d at 148–49. Ms. Baker's and Mr. Taglione's independent decisions to leave after being placed on a PIP or performance plan are not evidence that Mr. Lucas was about to be forced out.[1]

Nor did Mr. Lucas's placement on a performance notice create working conditions that were "so intolerable" that a reasonable person under the circumstances would have felt compelled to resign. This is so for four reasons. First, Mr. Lucas *immediately* retired upon learning of the performance notice. At the time that Mr. Lucas submitted his resignation letter,

---

[1] Mr. Lucas argues that evidence of discrimination against Ms. Baker and Mr. Taglione is admissible evidence of a "pattern and practice" of discrimination. (ECF No. 41, at 14.) This is true of, for example, Mr. Johnson's ill treatment of Ms. Baker, Mr. Taglione, and other older workers. But as the Court noted, there is no evidence of a nexus between this ill treatment and Mr. Lucas's resignation. Moreover, Ms. Baker and Mr. Taglione, like Mr. Lucas, immediately left their positions upon being placed on a PIP or a performance plan. As the Court explains, these steps were not so intolerable as to force Plaintiffs and Ms. Baker out of their jobs, nor was it reasonable to construe these steps as necessarily leading to termination. Thus, Ms. Baker's and Mr. Taglione's hasty and unreasonable departures are not admissible pattern-and-practice evidence vis-à-vis Mr. Lucas.

only four days had elapsed since Ms. Hatfield's warning to Mr. Lucas that if his numbers did not improve he would be placed on a PIP, and it was only a few hours after he learned that he was being placed on the performance notice. The haste of this decision, while perhaps evincing understandable frustration, precludes a finding of intolerable circumstances under which a reasonable person would have felt compelled to resign. *See Bowers v. Hamilton City Sch. Dist. Bd. of Educ.*, No. CA2001-07-160, 2002 WL 449499, at *7 (Ohio Ct. App. Mar. 25, 2002) ("Part of an employee's obligation to be reasonable is an obligation not to assume the worst, and not to jump to conclusions too fast.").

Second, Mr. Lucas decided to resign without even learning the contents of this performance notice. It is possible that there are some circumstances in which the terms of a performance plan could be so unreasonable that the termination writing would be on the proverbial wall. *See Baer v. Scotts Co.*, No. 01AP-323, 2001 WL 1548759, at *7 (Ohio Ct. App. Dec. 6, 2001) (finding that plaintiff failed to present evidence that his performance plan was "impossible to complete"). But here, where the notice had not yet even been written, the attainability of its terms cannot be known. Mr. Lucas is not entitled to the benefit of the doubt when it was his swift decision that prevented the terms of the performance notice from even being set.

Third, "[c]riticism in performance reviews and institution of performance improvement plans, alone, do not constitute objectively intolerable conditions." *Agnew v. BASF Corp.*, 286 F.3d 307, 310 (6th Cir. 2002). So even if Mr. Lucas had been placed on a stringent PIP with unforgiving terms, it is unlikely that those circumstances would rise to the level of a constructive discharge.

Moreover, even if a performance plan could itself constitute sufficiently intolerable conditions, there is no indication that Plaintiffs were placed on a performance plan because of their age. Younger employees were also placed on performance plans, including Andrew Smith and Genese John, the latter of whom was terminated for inadequate performance. Mr. Lucas offers no persuasive explanation for why his placement on a performance plan was age-related but Mr. Smith's and Ms. John's were not.

Fourth, Plaintiffs contend that termination was the inevitable next step after being placed on a performance plan or a PIP. The evidence demonstrates that that is not so. Multiple Charter employees have successfully completed performance plans or PIPs in recent years, including management-level employees.

Charter's Motion for Summary Judgment on Mr. Lucas's claim is **GRANTED**.

IV.     **CONCLUSION**

It is not this Court's role to "sit as a 'super-personnel department,' second-guessing management decisions." *Hardesty v. Kroger Co.*, 758 F. App'x 490, 496 (6th Cir. 2019) (quoting *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 960 (8th Cir. 1995)). All that matters for purposes of this litigation is that neither Mr. Taglione nor Mr. Lucas has put forth sufficient evidence to connect any evidence of age discrimination with prohibited actions under § 4112.14.

For the reasons set forth above, Defendant's Motions for Summary Judgment are **GRANTED**.

**IT IS SO ORDERED**.


/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**